My name is Andrew Koenig, appearing for Appellant Calvin Johnson. My main focus today is going to be on what I perceive to be the most flawed portion of the decision, and that's the fifth step analysis of the vocational issues in this case. As we all know, at the fifth step, the burden does shift to the commissioner to show that there are other jobs a person can do with the impairments found by the ALJ. The ALJ found on a physical side, Mr. Johnson was restricted to light work, which is an assessment we do not dispute here. So we're on a physical side at light work. The main point of emphasis I want to make, though, in this case, is this case is essentially a claim for disability based on mental impairments, and in questioning the vocational expert at the hearing, the hypothetical relied upon by the ALJ had just a minimal mental impairment included. The ALJ, in addition to the restriction to light work, included an impairment of simple unskilled work without frequent interaction with the public or fellow employees. That's it. Now my client has had, from his treating psychiatrist, Dr. Parrish, treatment for anxiety and major depression from 1992 on. This case was filed based on a mental impairment. There is clearly substantial evidence in the record that would support a finding that there was many more mental impairments than the ALJ posed to the vocational expert, and it's clearly established law that if a vocational expert's hypothetical is incomplete, it cannot be relied upon to meet that fifth step burden. My client's treating psychiatrist, Dr. Parrish, has throughout the record stated his belief that my client has been totally disabled since 1992 on a psychiatric basis. The only doctor that countered that is a consultative examination from 1994, which was seven years prior to the hearing, which Dr. Harrington, the consultative psychiatrist, found essentially no significant impairments, which, based on my experience, is not uncommon in these cases. There was one other doctor that did examine the patient, my client, and that was Dr. Ho in 1999, which is after the date last insured, but I would say if it's ordered and it is an expert opinion, it should not just be summarily disregarded because it happens to be after date last insured. Assessing a psychiatric condition entails going through history. Tell me, counsel, why did the ALJ discount the treating psychiatrist's opinion? Well, essentially it was based on that 1994 report of Dr. Harrington, and within that report, there was some reference made to his conditions had improved greatly, and the findings were minimal by Dr. Harrington and the consultative exam, but that's a single isolated report. But it wasn't because of inconsistencies in Dr. Parrish's diagnosis? No, it was essentially because there were breaks in treatment, and from 1992 to approximately 1995, my client did not go to see Dr. Parrish, which is not good. I would have loved him to go monthly, but at the same time, it's part of the nature of a mental illness that perhaps you're not making the best choices for your own treatment, and I firmly believe that's what happened here because when he did start going back to Dr. Parrish again in 1995, 96, 97, the symptoms were similar, if not worse, than when he stopped seeing him in 1994. And Dr. Parrish has issued later reports from 97 saying he believes he had been consistently disabled back to 1992, even though there's a gap in treatment. You know, the commissioner would argue that, well, yes, the evidence establishes in 92 is I don't think the record shows that that's a real common sense reading of the overall medical records here. Harrington's opinion was based upon independent clinical study that Harrington conducted, so isn't that sufficient as a basis for denying the treating physician's opinion? Dr. Harrington did not administer standardized psychological testing. The nature of a psychological assessment is talking to the person in a consultative exam for however many minutes. The only doctor to cite to objective medical testing is Dr. Parrish that says there was an MMPI done. I was not counsel at the hearing level, but that did not get submitted into the record for some reason, but Dr. Parrish did have an analysis of the MMPI that did support the major depression diagnosis. That's the only objective test ever referenced throughout this record. Otherwise, it's literally talking to the patient. And I'd say a consultative exam usually lasts well less than an hour, and an hour exam in 1994 should not serve to overcome the treating doctor's opinion over a six-year period. The second point on the vocation. I just get a clarification. ALJ does say somewhat ambiguously, and that's what I think Judge Reimer's question went to, I suspect, as well, which is I'm looking at ER-4. In January 1997, references to Parrish submitted a statement indicating that the claimant's ability to perform the mental demands of work is seriously limited. Specifically, Dr. Parrish indicated that the claimant's ability to perform simple work. Maybe I'm reading it in the wrong hand. No, I'm sorry. I'm on the wrong page, page three. I'm talking about the March 1992 diagnosis. It refers to the mental status examination did not reflect any serious findings, and the examiner suggested a generalized anxiety disorder, citing Exhibit 2F, and then gives us the reason for discounting it, that he is not providing any objective evidence to support his assessment. So he discounts it and then goes to Dr. Harrington. And I looked in both of them, and I saw mental status exam sections, but I didn't see any clinical. I mean, they're called clinical, but what you're saying is that what that means is that they sat down and went through a formal interview process. Yes. And did Dr. Harrington do anything more or less other than the MMPI than Dr. Parrish did as far as the record shows? No, to clarify, Dr. Harrington did not administer the MMPI. Okay. Dr. Parrish refers to an MMPI test being done, I believe, through Kaiser, but the test itself was not in the record. The only reference from any psychiatric expert to an objective test is from Dr. Parrish, who concludes, we have to trust him because we can't look at it independently, that it does support the diagnosis of the major depression. And a major point here is, even if we adopt the ALJ's own findings on mental impairments, he did not include all of those in the hypothetical. Okay? He found moderate impairments with maintaining social functioning and with deficiencies in concentration, persistence, and pace. Again, the one mental impairment included in the hypothetical did deal with, you know, no frequent interaction with the public, which could be subsumed under the social functioning, but it has nothing to do with persistence, pace, and those types of deficiency in maintaining work throughout the eight-hour workday. So even if we're adopting the ALJ's findings, he had an inadequate vocational expert question. Under Social Security Ruling 96-8P, it's very clear that those broad categories, social functioning, deficiencies of persistence and pace, et cetera, et cetera, are broad categories to be considered at the step two if it's severe, and step three if there's a meeting of a listing. Once we get to step five, those broad categories have to have more specific limitations thereunder posed in a vocational expert hypothetical question. There was absolutely nothing that could be construed as, you know, relating to moderate deficiencies in persistence and pace. Quickly, and then I'll reserve it if I have any time. I don't. The ALJ totally ignored the requirements of SSR 004P, and this record is as confusing as I could get, as I could evaluate as to what actual job the VE is saying this person could do. That needs to be clarified, and it is the ALJ's responsibility under SSR 004P to address those conflicts, not ours. Thank you. Ms. Kim. Good morning, Your Honors. I'm Joanne Kim, and I'm here on behalf of the Commissioner of Social Security. Counsel to my right is John Karbalas. The Commissioner believes that substantial evidence supports the ALJ's decision that the claimant was not disabled at any time prior to his date last insured for benefits. And to be more specific, he was last insured for disability insurance benefits on March 31, 1993. In addition, he was last insured for Medicare benefits on December 31, 1997. So in order to prove that he was entitled to disability insurance benefits, he needs to show disability prior to March 93, and I think that's a distinction we need to remember. When was the incident that his coworkers found him very dangerous and threatening, and he went to the psychiatrist and said that he was having ideation of killing his coworkers? What was the date of that? I believe that was in 92 or prior to 92. So it's prior. There was a history of some homicidal ideation that is in the record. Yes. Now, what employer with that background known to him or her would have employed this individual? I think the fact that he- Besides the Postal Service. Besides the Postal Service. Well, I believe- Chief John, I'm sorry. I couldn't resist. Well, I believe that the history of him taking a gun to work- My question is- I'm sorry. What employer, knowing that, would have hired him? Well, I don't believe any employer would want someone taking a gun to work, but I want to emphasize that this was way in the past, I think in the early 90s, and this was before he sought psychiatric treatment. I believe he started seeing Dr. Parrish mainly in 92, a little bit in maybe 90. So he wasn't taking any psychiatric medications at that time, so he was having some problems, definitely. But, you know, I think the fact that he took a gun to work, it doesn't necessarily show that he was disabled, perhaps dangerous. But Dr. Parrish said part of his problem is that he's paranoid. Yes. But addressing Dr. Parrish, I'd like to emphasize that there were significant gaps in treatment with him. Between 92 and 95, the claimant didn't seek any treatment. Well, that's part of the disease sometimes. Yes, I understand that. But in July 94, when he was examined by Dr. Harrington, he reported to Dr. Harrington that the reason he wasn't undergoing psychiatric treatment at that time was that he was no longer experiencing these symptoms, and so he did not feel the psychiatric treatment was necessary at this time. I believe that's on the transcript page. 276. Also, Dr. Parrish said that he'd reported, the patient had reported that he'd tried to get work and he'd tried to adjust to it for several years and was simply incapable of doing so. What do we make of that? That he tried to adjust to, I'm sorry? He said that he had tried to work and to adjust to work and he had found that he couldn't do it. Okay, this was reported to Dr. Parrish. Well, I believe that Dr. Parrish's opinion was properly rejected by the ALJ. By citing Dr. Harrington's opinion, who examined the claimant independently, that was substantial evidence to reject Dr. Parrish's opinion. In addition, I'm sorry, the ALJ noted that Dr. Parrish's opinions were inconsistent with the claimant's own statements. For example, records from the claimant's stress management program indicate that he experienced significant improvement in his symptoms and he reported that his stress level was very low, and that's at transcript site 198. In addition, the claimant testified at the hearing that he returned to work full-time in July 2000. And this contradicts Dr. Parrish's November 98 opinion that he thought the claimant would not be able to return to work for another three years. In fact, he went back to work about a year and a half after that opinion. So that was another contradiction of Dr. Parrish's opinion. With respect to the vocational evidence, ALJ's hypothetical question limited the individual to light exertional work with a mental limitation to unskilled simple work without frequent interaction with the public or fellow employees. While the claimant argues that the ALJ didn't include his moderate finding of deficiencies in concentration and persistence or pace, the ALJ fully considered these moderate limitations and found that the claimant's impairment was severe. However, then he subsumed these moderate limitations into his residual functional capacity and found that the moderate limitations didn't prevent him from performing unskilled work. I'd like to also point out that the vocational expert actually provided a definition of moderate at the hearing, and that's at transcript site 112. The vocational expert stated that for him the definition of moderate limitation is one that would affect but would not preclude the ability to perform a given task. And the plaintiff's counsel below accepted this definition. Thus, even though we have a moderate limitation, that doesn't mean that the claimant cannot perform a given task. And the ALJ found that while this moderate impairment might prevent him from performing complex work, it would not prevent him from performing simple, unskilled work. Accordingly, his hypothetical question to the vocational expert was supported by substantial evidence because his RFC was supported by substantial evidence, namely Dr. Harrington's opinion. In addition, there were some state agency doctors' opinions who also concluded that the claimant could perform simple, repetitive tasks. With respect to the alleged conflict between the vocational expert's testimony and the Dictionary of Occupational Titles, the Commissioner's position is that there was no significant conflict between these two. The ALJ properly relied on the uncontroverted testimony of the vocational expert in determining that the claimant could perform alternative work. The vocational expert identified three occupations that the claimant could perform, that of an assembler, an inspector, and a packager. The district court noted that there was a discrepancy between the inspector job cited by the DOT and the DOT code given. However, even if you were to eliminate this job, there were still two jobs remaining that existed in significant numbers in the local and national economy. The claimant contends that there's another conflict between his alleged mental limitations and the mental demands in the areas of reasoning and language development in these jobs identified by the vocational expert. However, the DOT defines reasoning and language development as aspects of education required for satisfactory job performance. The Commissioner does not evaluate education using the criteria contained in the DOT. Rather, the Commissioner evaluates education in terms of literacy and years of formal education. Generally, a claimant's numerical grade level is used to determine educational ability. Here, the claimant has a 12th grade education, and the Commissioner considers that someone with such a level of education can perform semi-skilled through skilled work. As the ALJ found that the claimant could perform unskilled work, there simply was no conflict. And finally, I'd like to point out that the regulations define unskilled work as work which requires little to no judgment to do simple duties that can be learned on the job in a short period of time. And that's at section 404.1568A of the regulations. This definition accurately describes the jobs identified by the vocational expert in this case. These jobs had a specific vocational preparation time of two, which means that the jobs can be learned by short demonstration up to and including 30 days. I believe this Court held in Terry v. Sullivan that jobs with a specific vocational preparation time of two corresponds with the Social Security's definition of unskilled work. Accordingly, there simply was no conflict between the vocational expert's testimony and the DOT. Okay. Okay, thank you, Ms. Kim. Thank you, Mr. Koenig. The matter just argued will be submitted. And next to her are Annette and Fernandez. Good morning, Ms. Schenberg.
judges: B. Fletcher, Rymer, Fisher